## KINNEY *vs.* THE CITY OF SYRACUSE.

The 9th section of the act of the legislature, of April 17, 1858, " to amend the act to revise the charter of the city of Syracuse," by which a portion of the city of Syracuse, on the easterly line of the city and adjoining the town of Dewitt, was taken from the city and annexed to the town of Dewitt, and two assembly districts were thereby altered, without any provision being made in respect to the political *status* of the inhabitants of the exscinded and annexed territory, or defining their rights in reference to the assembly districts, or the manner in which they should participate in the election of representatives from the several districts, was a violation of the provision of the constitution, contained in the fifth section of the third article, that the assembly districts, when once fixed and determined by the board of supervisors, shall *remain unaltered*, until the next decennial enumeration ; and is therefore void. W. F. ALLEN, J., dissented.

The *incidental* alteration of the boundaries of an assembly district, resulting from an act of the legislature changing such boundaries, is an alteration of a district, within the prohibition of the constitution.

The provision in the constitution, which secures assembly districts, when once fixed and determined, from alteration, was intended to be, and is, not merely a prohibition upon the *board of supervisors*, but also a restriction upon *the legislative power* to alter and change the boundaries of towns.

THIS is a case agreed upon by the parties, for the purpose of determining the validity of a levy made under a warrant issued under the authority of the city of Syracuse, and of the assessment upon which the same was issued, and the liability of the plaintiff to pay any sum for taxes assessed under or by the corporate authority of the city, for the years 1858 and 1859, upon the real estate of the plaintiff, and also the damages sustained by the plaintiff by reason of the assessment, levy and sale made by the city, in case said assessment, levy and sale should be adjudged to be invalid. The necessary facts appear in the opinion of the court.

*C. Andrews,* for the plaintiff. I. The assessors of the city of Syracuse can assess, and the common council of said city can tax, *only* the land within the corporate limits. (*Laws of* 1857, *ch.* 63, *tit.* 5, § 22 ; *tit.* 6, § 1.) The lands of the plaintiff are included in the territory taken from said city by the

act of April 17, 1858. (*Laws of* 1858, *ch.* 341, § 9.) If that act is constitutional, in so far as it established the eastern boundary of said city, then the assessment, levy and sale in question is void, and the plaintiff is entitled to recover.

II. The constitution vests in the senate and assembly the whole legislative power of the state. (*Const. art.* 3, § 1.). No restrictions upon its exercise can be recognized by the courts, other than those which are specified *in terms* or *necessarily* implied. This results from the rule that written constitutions are to be *strictly construed.* (*Purdy* v. *People,* 4 *Hill,* 398. *People* v. *Cowles,* 3 *Kern.* 350. *Ex parte McCollum,* 1 *Cowen,* 550.) The power to create or change the boundaries of cities or towns, is plainly legislative in its character. It has uniformly been exercised by the legislature. (*People* v. *Morrill,* 21 *Wend.* 563, *Cowen, J.*) The power is as clearly conferred by the general grant of legislative power, as though conferred in specific terms, and unless specially restrained, it is in the discretion of the legislature, as to the *time* and *mode* of its exercise. (*Benson* v. *Mayor &c.,* 24 *Barb.* 255 to 259. *Tanner* v. *Trustees of Albion,* 5 *Hill,* 121.) The rule requiring strict construction of written constitutions, is no less imperative when applied to clauses purporting to *restrain* legislative power, than when applied to clauses *granting* such power. (1 *Story's Const.* §§ 424, 225.) *A fortiori* is this true, when the restraint claimed is not by direct limitation but by implication. (*People* v. *Draper,* 15 *N. Y. Rep.* 532. *Sill* v. *Village of Corning,* 15 *id.* 297. 18 *id.* 67. 2 *Clark & Finn,* 36. 21 *Penn. Rep.* 160. 10 *id.* 70.)

III. The 9th section of the act in question is not in conflict with that provision of the constitution which provides that the assembly districts, organized pursuant to the constitution, "*shall remain unaltered until another enumeration.*" (*Const. art.* 3, § 5.) The *incidental* alteration of the boundaries of an assembly district, resulting from a statute changing the boundaries of a city or town, is not an *alteration* of an assembly district, *within the prohibition of the constitution.* 1st. The

legislature did not intend, nor does the act in question purport, to alter an assembly district. The intention of the legislature, derived from the language of the act, was to exercise an acknowledged legislative power, in amending " An act to revise the charter of Syracuse," and to establish a new eastern boundary thereof. (*Supervisors of Niagara* v. *People*, 7 *Hill*, 511, *Porter, senator*. *People* v. *Draper*, 15 *N. Y. Rep.* 545.) 2d. The prohibition against the alteration of assembly districts does not, by *implication*, restrain the legislature, in the exercise of its power to change the boundaries of cities and towns. This prohibition was not intended to apply to the *mere consequences* of the exercise of the legislative power, in the alteration of towns. (*Schuyler county case, opinion of Strong, J.*) The restraining clauses of the constitution are only to be applied to the *identical powers* contemplated by them. They cannot be extended to powers even of a *kindred* nature, but they must be the same in all their essential particulars. (9 *Wheat.* 204.) The power to alter assembly districts, and to change the boundaries of towns and cities, are essentially different, and are reposed in distinct political bodies. (*Const. art.* 3, § 5.) There is no *necessary implication* derived from the clause of the constitution in question, which restrains the exercise of the legislative power. 3d. The restriction upon the legislative power claimed to exist in this case, would result in great public inconvenience. No town, city or county could be organized or changed, where it involved a change, however trivial, in the boundaries of assembly districts, except decennially, and by the first legislature after the decennial enumeration. So, if the disputed boundary between New York and Connecticut should be adjusted by a cession of territory within the present jurisdiction of Connecticut, it could not be annexed to any existing town, intermediate the decennial enumeration. 4th. It is apparent from the scheme of the constitution in respect to the formation of assembly districts, that the prohibition against their alteration was intended *as a prohibition upon the supervisors*, and not a

restriction of the legislative power to alter and change the boundaries of towns. By the constitution of 1821, there were no single assembly districts. (*Const. of* 1821, *art.* 1, § 7.) By the present constitution, the power to form assembly districts is *exclusively* vested in the supervisors of the respective counties. The power of the legislature is limited to an *apportionment* of the members of the legislature, among the several counties : it has no power whatever to *form or designate* assembly districts. (*Const. art.* 3, § 5.) The constitution, after vesting in the supervisors the exclusive power to form assembly districts, then limits the power by providing " that the district to be made shall remain unaltered until another enumeration." The primary object of this provision was to regulate the action of the supervisors. The debates in the convention show this to have been the object of the insertion. (*Debates, Atlas ed. p.* 422.) A statute *purporting* to form or alter an assembly district would be clearly unconstitutional, because that power is, by the constitution, reposed in the local legislatures of the counties : but it does not follow that the general power of the legislature to change the boundaries of towns is restrained by a prohibition primarily directed against the supervisors.

IV. By the terms of the constitution the assembly districts to be formed by the boards of supervisors are to consist of convenient and contiguous territory, "but no town shall be divided in the formation of assembly districts." (*Art.* 3, § 5.) Assembly districts will therefore necessarily consist of certain municipal corporations, called towns, and will be so designated and described, and will not be described by physical boundaries and geographical lines. The assembly district is not therefore altered by changing a town line, but still consists of the same towns of which it was formed.

V. If it should be held that the legislature are prohibited by the clause relating to the alteration of assembly districts, from passing an act whereby electors residing in one assembly district become electors in another assembly district, then we

say, 1st. That the act in question does not *ipso facto* determine the assembly district, or the election district in which the electors residing in the territory taken from the city were entitled to vote. The constitution provides that an elector shall be entitled to vote at any election in the election district of which he shall at the time be a resident, and not elsewhere. (*Const. art.* 2, § 1.) There is no provision in the constitution as to the manner of organizing election districts, or as to the territory which shall compose them. The legislature has power, therefore, to provide that election districts may consist of territory lying in two towns, or of territory partly in a city and partly in a town. The legislature has power also in changing the boundaries of towns, to provide that the territory affected by the alteration shall remain connected with the assembly and election districts to which it originally belonged. This principle was decided in the Schuyler county case. (*See opinion of Strong, J.*) The provision of the constitution that no town shall be divided in the *formation* of assembly districts, has reference only to the time of the general organization of these districts. (*Const. art.* 3, § 5. *Schuyler Co. case.*) 2d. If, therefore, the legislature had *expressly* provided in the act in question that the territory added to the town of Dewitt should remain a part of the second assembly district of the county of Onondaga, and of the election district to which it was attached at the time the act was passed, no constitutional objection could have arisen. If an *express* provision of this character would have avoided the constitutional objection, then this provision is *implied* without an express declaration, if necessary to sustain the statute. (13 *Barb.* 301.)

VI. There would be no violation of any constitutional provision if it should be held that by the annexation the electors, in the territory taken from the city, were deprived of the right of voting for member of assembly until the next enumeration. A deprivation of the right of voting for a particular officer for a limited period, incident to the reorganization of a town, would not be a violation of the constitution.

VOL. XXX. 23

VII. Assuming that the provision in the act of April 17, 1858, annexing the territory taken from the city to the town of Dewitt is unconstitutional, it would not affect the validity of that part of the act which defined the eastern boundary of the city. The result would be that this act repealed the original charter of the city, so far as it took the territory in question from the town of Salina and restored it to that town. (*Fisher* v. *McGirr*, 1 *Gray*, 22. *Cone* v. *Kimball*, 24 *Pick.* 361. *Bank of Hamilton* v. *Dudley*, 2 *Peters*, 526. *Ely* v. *Thompson*, 3 *Marsh.* 73.) In *Fisher* v. *McGirr*, the court say: "The principle is now well settled that when a statute has been passed by the legislature, under all the forms and sanctions requisite to the making of laws, some part of which is not within the competency of the legislative power, or is repugnant to any provisions of the constitution, such part thereof will be adjudged void and of no avail, whilst all other parts of the act, not obnoxious to the same objection, will be held valid and have the force of law."

VIII. It is a primary rule in construing statutes claimed to conflict with the constitution, that in cases of doubt every possible presumption and intendment will be made in favor of the constitutionality of the act in question, and that the court will only interfere in cases of clear and unquestioned violation of the fundamental law. (*Sedg. on Stat. and Const. Law,* 482. *Fletcher* v. *Peck*, 6 *Cranch*, 128. *Morris* v. *People*, 3 *Denio*, 394. *Newell* v. *People*, 3 *Seld.* 109. *Ex parte McCollum*, 1 *Cowen*, 550.) The construction of the constitution by the legislature, as given in its acts, ought to have great weight, and should not be overruled, unless manifestly erroneous. (5 *Mass. Rep.* 524, 554. 6 *id.* 401, 417. 12 *id.* 252, 257.) Strong, J. in the Schuyler county case, says: "The power of the legislature to erect new counties is undisputed. It is not restricted as to time or place, or in any respect, except as to the required population. In the exercise of such power the legislature has constituted the county of Schuyler. In doing so, it has necessarily, and without being able to avoid the difficulty, contravened what may be presumed to have

been the intent of the framers of the organic law, in a comparatively unimportant particular. *The acknowledged power and the presumed intent are antagonistic. Which shall prevail? Most assuredly the former."* We submit that upon reason and authority the act of 1858 must be sustained.

*H. S. Fulton,* for the defendant. The defendant claims that the provisions of section 9, chapter 341 of the laws of 1858, are in their main scope and object in direct conflict with that part of section 5 of article 3 of the constitution, in these words: "and the apportionment and districts so to be made, shall remain unaltered until another enumeration shall be taken under the provisions of the preceding section;" and that, therefore, all such provisions are void.

I. The main scope and object of the section under consideration is the annexation, the merger of a part of the municipality of Syracuse in, and the enlargement of, the town of Dewitt. It was manifestly as much the intention of the legislature to make the territory in dispute, with the inhabitants residing thereon, for every purpose a part of the town of Dewitt, as to cut it off from the city of Syracuse for any purpose. If this object is not effectually accomplished, there is no ground on which to infer that the legislature would have sanctioned such annexation and its consequences. (*Warren* v. *Mayor of Charlestown,* 2 *Gray,* 100.)

II. By the provisions of said section 9, the legislature has attempted an alteration of the second and third assembly districts in the county of Onondaga, within the meaning of the above provision of the constitution, and in contravention of it. (1.) This restriction upon the powers of the legislature was inserted in the constitution for the purpose of rendering assembly districts, when once framed, permanent and unalterable until the next decennial apportionment. Such permanence as is intended by the constitution, can only be attained by the legislature wholly abstaining from taking inhabited territory from, or adding such territory to, assembly districts.

(3 *Seld.* 83.) (2.) By the provisions of the section under consideration, the territory of the second assembly district is attempted to be diminished by 1200 acres, and its population by 200 persons. In place of the political rights and duties pertaining to these persons as inhabitants of the second assembly district, is attempted to be substituted the political rights and duties of inhabitants of the third assembly district. It is difficult to see how an assembly district can be altered, if this be not an alteration. (*See cases cited below.*)

III. It is submitted, that it cannot be claimed that the provisions of this section are so far valid as to transfer the territory in dispute to the town of Dewitt, for all purposes except the election of member of assembly, and that as to such election, the right of such inhabitants to vote in the election of member of assembly would be suspended until the next apportionment, because, (1.) Such was not the intention of the legislature, nor is it the language of the law. (2.) The suspension of the right of a portion of the inhabitants of an assembly district to vote in the election of members of assembly, would be an alteration of that assembly district within the meaning of the constitution. (3.) Such an enactment would deprive the inhabitants residing upon this territory of rights secured to them by section 1 of article 2 of the constitution.

IV. The provisions of said section 9 are unconstitutional, because of an entire failure to provide any means by which the inhabitants of the territory in dispute, after the annexation, can participate at all in the election of members of assembly. (2 *Gray*, 105.) (1.) The transfer of a whole town from one assembly district to another, without qualification or reservation, would be an alteration of both, and therefore void; while a transfer of such town for all purposes except the election of members of assembly, securing to the inhabitants so residing in such town the right to vote in the election of members of assembly in the district from which such portion is cut off, might not be an alteration of either, and therefore valid. (*Rumsey* v. *People*, 6 *Cush.* 575, 578.. *Warren* v.

*Mayor of Charlestown,* 2 *Gray,* 103. 33 *Maine Rep.* 587. 19 *Barb.* 91.)

V. But it is submitted, that part of a town or a city in one assembly district could not be annexed to a town in another district, even with such reservations as would make it necessary for voters residing in such part of such town or city to vote in one election district for state officers, and in another district for member of assembly. Such a requirement would seem to conflict with section 1 of article 2 of the constitution.

VI. The provision of the constitution referred to, applies, as well to an act where its consequences would be to alter an assembly district, as to an act passed for the purpose of altering an assembly district; otherwise all restriction upon the power of the legislature is practically annulled. If 1200 acres and 200 persons can be constitutionally transferred from one district to another, a greater number may, and a greater, until there be not one inhabitant remaining.

VII. Chapter 341 of the laws of 1858 is unconstitutional, by reason of a defect in the title, and because it contains more than one subject. (*Const. art.* 3, § 16. 1 *Seld.* 285.)

BACON, J. This is a case agreed upon by the parties, for the purpose of presenting for adjudication the question of the constitutionality of the 9th section of the act passed by the legislature on the 17th of April, 1858. This act, by its title, purported to be "An act to amend the act, to revise the charter of the city of Syracuse." The facts necessary to be stated, in order to present this question, are, that in 1857 the board of supervisors of the county of Onondaga, pursuant to the act passed in April of that year, requiring the formation of assembly districts, duly met and divided the county of Onondaga into three assembly districts. By this division the city of Syracuse formed a part of the second, and the town of Dewitt a part of the third, assembly district; that town never having been at any time within the second district.

By the 9th section of the act of 1858, above alluded to, a portion of the city of Syracuse upon the easterly line of the city, and adjoining the town of Dewitt, was taken from the city of Syracuse and annexed to the town of Dewitt; or, in other words, the easterly boundary of Syracuse was changed by running a line which cut off from the city a territory about two miles in length, and one in breadth, embracing from twelve to fifteen hundred acres of land, on which some two hundred and fifty persons resided, of whom fifty were voters, and annexed this territory to the town of Dewitt. This is the whole scope and purport of the section; and neither in the section, nor in any part of the act, is any provision made in respect to the political *status* of the inhabitants of the ex-scinded and annexed territory; nor how, if at all, they shall be reckoned in regard to any assembly district, or in what manner participate in the election of a representative for such district.

The plaintiff in this suit, at the time of the passage of the act, resided, and still resides, within the territory thus set off, and owned real estate therein, subject to taxation. The authorities of Syracuse, subsequent to the passage of the act of 1858, caused a tax to be assessed upon his property within this district; issued a warrant for its collection, and levied upon and sold some property of the plaintiff to satisfy the tax. The ground assumed by them is that the law, by which this territory was attempted to be set off to another town and assembly district, was unconstitutional and void, and that consequently the territory still remained a part of the city of Syracuse, and liable to contribution toward its public burdens; and that is the precise point presented in this case. The defendant claims that the 9th section of the act in question is in direct conflict with section 5 of the third article of the constitution. This section, after providing that members of assembly shall be apportioned among the several counties of the state as nearly as may be according to the number of their respective inhabitants, directs that the supervisors of

the several counties shall meet on a specified day, and divide their counties into as many assembly districts as they shall be entitled to by law, each assembly district to contain, as nearly as may be, an equal number of inhabitants, and to consist of convenient and contiguous territory. It is further provided in this section that the legislature, at its first session after the decennial enumeration, shall reapportion the members of assembly, and the boards of supervisors shall meet and divide their counties into districts as before, and then it is added, "*the apportionment and districts so to be made shall remain unaltered until another enumeration shall be taken under the provisions of the preceding section."*

It may be remarked, preliminarily, that it is not claimed that there is any specific power given, in the constitution, to the legislature to create, or change, the boundaries of cities or towns within this state. But it is claimed that the authority necessarily results from the grant to, and investiture of, the senate and assembly with all legislative power. The power being plenary, no restrictions can be imposed upon its exercise save such as are in terms specified in the constitution, or are necessarily implied therefrom. The power to create towns, or to change their boundaries, is not only legislative in its character, but has been frequently exercised by the legislature; and, irrespective of any provision which would control or circumscribe it, must rest in the discretion of the legislature as to the time and manner of its exercise. All this may be readily conceded; but being so, the question recurs, is not this power, thus claimed and assumed, controlled and restricted in its exercise by a precise constitutional provision, which the action attempted in this case contravenes?

The counsel for the plaintiff, in his very learned and ingenious argument, insists that the act in question is not in conflict with the injunction of the constitution that assembly districts, when organized pursuant to its provisions, "shall remain unaltered until another enumeration," and bases the argument, substantially, upon two propositions: 1st. That

the *incidental* alteration of the boundaries of an assembly district, resulting from an act changing such boundaries, is not an alteration of an assembly district, within the prohibition of the constitution ; and 2d. That the provision that secures such districts from alteration was intended to be, and is, only a prohibition upon the board of supervisors, and not a restriction upon the legislative power to alter and change the boundaries of towns.

I. In support of the first proposition, it is claimed that the act does not, in its terms, purport to alter an assembly district, and that the purpose of the legislature, as indicated by the title of the act, being to exercise an acknowledged legislative power, it cannot be pronounced void, on the ground that another intent in fact existed, and that it incidentally and indirectly accomplishes an object that could not, without a breach of the constitution, be directly effected. In answer to this suggestion, it might not perhaps be impertinent to remark, that it is sometimes quite unsafe to assume the intent of the law-makers, either from the object apparently avowed, and seemingly patent on the face of the statute, or the language in which they have clothed their enactments. But it seems to me quite clear that if a particular thing is forbidden, in the constitution, and therefore placed beyond the legitimate pale of legislation, the legislature has no more power to override and nullify the provision, although they accomplish it incidentally by attempting to use in a given way another conceded power, than they have to reach the same end by a specific act avowedly for the very purpose itself. If the doctrine contended for is to prevail, then there is no protection to any constitutional provision in its integrity, and all restriction upon the legislative power is practically annulled. If the consequences—the necessary results—of an act are to alter an assembly district, then the constitutional prohibition is as fairly and as indispensably applicable to it as if in terms and by express language it altered the district, and was enacted with that plain and avowed object.

Now it will not be denied that the main scope and purpose of the section of the act we are considering, was to effect the annexation of a portion of the territory of Syracuse to the town of Dewitt, and to transfer the inhabitants of the district from the former to the latter. There could have been no object in the enactment if it did not accomplish this end. In securing this result, it necessarily follows that both the assembly districts Nos. 2 and 3 are altered. They are altered both in respect to the territory embraced by them, and the number of inhabitants of which they were composed at the time the districts were designated by the supervisors. And it seems to me there is no escape from the conclusion that this is a violation of the constitutional requirement that the districts, when once fixed and determined, should remain, until the next decennial enumeration, unaltered.

What was the object intended to be effected by the mode provided in the constitution for the formation of assembly districts? It was, among other things, to secure as nearly as might be, an equality of representation, as between the several districts into which a county might be divided. This is provided for, in terms, in the section of the constitution in question, by the injunction upon the supervisors, that they shall so divide the districts that they shall contain "as nearly as may be an equal number of inhabitants." And in the division and apportionment made by the supervisors of Onondaga county, in this case, it will be seen that they conformed to this injunction with a very remarkable approach to that enjoined equality. Thus, Onondaga county was divided into three assembly districts, the first containing a population of 24,184, the second 23,851, and the third 24,710.

But the effect of this act, to the extent that it reached, was to impair that equality, and it did so by taking away from the population of the smallest of the districts 250 inhabitants, and annexing them to the district that already had a preponderance of population over either of the others. Thus it trenched upon the representative equality which it

was the object of the division to secure. If it be said that this was only so small a division of the population that it did not essentially destroy the balance of the districts, I ask, in reply, where shall the line be drawn? If 1500 acres and 250 people may be set off from the city of Syracuse, and from the assembly district to which they had been assigned, what is to prevent the exscinding process from being extended until half the city has been set over, and thus while one district has been deprived of 10,000 inhabitants, another has been increased to the same extent, and instead of a representative population nearly equal, one has 13,000 and the other 34,000 inhabitants, each having but a single member to represent them in the assembly. And thus the process might go on until practically all but the merest fraction of a town might be set off, and the substantial body of its population transferred to another district.

There were doubtless, also, political reasons which entered into the consideration of the framers of the constitution, when the section we are considering was adopted. It was important to provide for such a construction of the districts that not only the population, *per se*, should be fairly represented, but the political preferences of those residing in the separate districts should have an opportunity to be expressed. In arriving at such a result, the supervisors would naturally, and very properly, group together in a district such a number of towns as would secure to them the election of such candidates as would represent the prevailing and preponderating sentiment of the district; and this being done, this division was to have a degree of permanency attached to it by remaining for a series of years unaltered. But it is easy to see that if this arrangement is to be subject to legislative interference, the whole object and purpose of the division may be entirely circumvented. The political balance of a county might thus be wholly destroyed, and in the foresight or apprehension of a closely contested election, and when a few electors, taken from a strong district where they can easily be spared, and

thrown into one so nearly balanced that a small importation will turn the scale, the whole state might become the subject of such legislative gerrymandering as to change the entire complexion of the popular branch, and practically defeat the whole design and operation of the single district system.

II. The second consideration urged by the counsel for the plaintiffs to uphold this act is, that the prohibition against the alteration of assembly districts, when once fixed, until the period arrives for another designation, is a prohibition upon the boards of supervisors, and not a restriction of the legislative power to alter the boundaries of towns. If this be so, then it results that the constitutional inhibition is utterly worthless. If it was deemed so important to preserve these districts in their integrity when once formed, that a shield was thrown around them in the organic law, for the very purpose of their protection, and this can be nullified by a simple legislative act, then the paper upon which the section was written might as well have been saved, for the clause is worth less than the rags of which that paper was composed. The section contains no language which points to the board of supervisors as the body on whom the restraint was to act, but it manifestly was intended to cover the whole ground, and prevent as well legislative as any other kind of interference. It will be seen that it preserves not only the districts, but the "apportionment," from alteration; and this was a subject exclusively of legislative cognizance, and the same clause which prevents the legislative authority from tampering with the one, equally places the other beyond their jurisdiction. The counsel for the plaintiff very frankly concedes that a law *purporting* to form or alter an assembly district would be clearly unconstitutional, because that power is reposed exclusively in the local legislatures of the several counties. I have endeavored to show, that what the legislative power could not by a direct act of legislation accomplish, cannot be effected by an indirect and incidental exertion of that power, even upon a subject confessedly within its general and acknowledged pow-

ers. In order to secure the good sought to be effected by the permanency of the single district system, and avoid the evils it was designed to cure, it was just as necessary to preserve it from legislative interference, as from any tampering with the districts by the boards of supervisors. Once exercised, their power was exhausted, and their work was to remain untouched, for the period prescribed by the constitution, by any other hands. These considerations lead me to the conclusion that the 9th section of the act of April, 1858, being an attempt to alter an election district contrary to the prohibition of the constitution, was unauthorized and void.

But if mistaken in the result to which the discussion thus far has led me, there is another ground which is equally fatal to the plaintiff. Granting that the act is so far valid as that it legally transfers the territory in question from the city of Syracuse, and incorporates it with the town of Dewitt for all other purposes, I think it must be conceded that so far as relates to the election of a member of assembly, the voters residing in the district are, for the time being at least, disfranchised. Where could the inhabitants exercise the privilege of voting? Not in Syracuse, for they are no longer residents of the city; and not in Dewitt, for when that assembly district was formed, this territory was within no election district in that town. The right secured to them by the 1st section of the 2d article of the constitution would thus be violated, and the deprivation or suspension of the right of a voter otherwise competent, by such an act would be, in my judgment, the alteration of an assembly district, within the spirit and meaning of the constitution. This difficulty could in no way be remedied but by a provision in the act itself, securing the right of the inhabitants to vote in the election district from which they had been taken, until the next decennial enumeration. Such a provision was incorporated into the act organizing the county of Schuyler, and was one among the other considerations which was relied upon to secure that act from judicial condemnation. The absence of any such

provision in the act in question here, is a fatal objection to its validity.

Upon this point we have two well considered authorities in a neighboring state, which cover the whole ground, and are, to my mind, conclusive. I may premise by remarking, that under the constitution of Massachusetts, the power to create and to change the boundaries of towns is derived not from any specific grant on that subject, but from the general power of the legislature to pass all useful and wholesome laws. Their scheme of government also contemplates and provides for an equal representation of the people by a distribution of representatives among the towns, according to the number of taxable inhabitants, at fixed periods of ten years. In the year 1851, the opinion of the judges of the supreme court of Massachusetts was asked by the legislature upon the question of their power to alter the boundary lines of counties and towns. In reply, the judges announced their unanimous opinion to be, that the legislature had that power, but that in exercising it, by annexing a part of one town to another, or by erecting a new town from one or more existing towns, it was necessary to reserve and secure to the inhabitants residing in such portion or portions, a right to vote in the election of representatives with the town or towns from which such portions were taken, until the expiration of the next preceding apportionment of representatives. (*See opinion of the Judges,* 6 *Cush.* 578.) In another opinion, to be found at page 575 of the same volume, upon a very similar question, it is remarked by the judges, that the constitution declares that the number of representatives for each city, town and representative district, shall remain fixed and unalterable for the period of ten years. " That which the constitution declares unalterable," say·they, " cannot be changed by law."

The case of *Warren* v. *Mayor &c. of Charlestown* (2 *Gray,* 84 *and onwards*) is a still more decisive adjudication upon the same point. An act of the legislature had undertaken to transfer the town of Charlestown to the city of Bos-

ton, and incorporate it with that municipality. The act also attempted to obviate the constitutional objections by various provisions to preserve the right of the people to vote, and securing them a proper representation in the councils of the state. The opinion of the court was delivered by Chief Justice Shaw, and has all the characteristics of his good sense and clear judicial mind. He held the act to be unconstitutional and void, by failing to secure to the inhabitants of the transferred territory the rights which the constitution and laws had guarantied to them. The town of Charlestown and the city of Boston were in separate representative districts. The inhabitants of the former could not vote in Charlestown, for the town as an organized corporation was annihilated, nor in Boston, because its territory was distributed into other districts. No provision was made for uniting them with any other corporation for the purpose of voting, and none that was adequate to enable them to vote in the district from which they had been taken. The inhabitants, therefore, for the time being and for an indefinite term of time, were, in that respect, wholly disfranchised.

The counsel for the plaintiff, pressed by this difficulty, puts forth the proposition, in one of his points, that if the legislature had expressly provided in the act that the territory added to Dewitt should remain a part of the second assembly district of Onondaga county, and of the district to which it was attached at the time the act was passed, no constitutional objection could have arisen. And he adds, that if an express provision would have avoided the constitutional objection, the provision may be *implied*, in order to sustain the statute; or the remedy may be supplied by future legislation. In answer to this, I say that no case ever has carried, or, in my judgment, ever will carry the doctrine of implication, as applied to a legislative act, to such a length as to incorporate into a statute an entire provision—no vestige, nor shadow, nor intimation of which is to be found there. And to the latter branch of the proposition I reply, in the words of Ch. J. Shaw in the

case above cited: "It is no answer to say that this is a defect which may be amended by the legislature. It would depend wholly on the will of a future legislature whether to amend it or not; whereas the act within itself should make provision for all the changes which it seeks to effect in the rights and condition of the inhabitants."

I will not farther pursue this discussion, nor allude to other considerations which were presented, and forcibly argued, by the counsel for the defendant. Upon the points already passed in review, my conviction is clear that the section of the act of April, 1858, which we have been considering, is a manifest violation of that provision of the constitution which secured the permanency of the assembly districts; and that the action of the defendant in assessing and levying the tax upon the property of the plaintiff, within the territory thus attempted to be set off from the city of Syracuse, was only the exercise on its part of an authority it rightfully possessed.

I ought to add, however, that the case of *Rumsey* v. *The People*, (19 *N. Y. Rep.* 41,) which was cited and commented upon by the plaintiff's counsel, is no authority upon the controlling propositions involved in this case. It presented many other questions, and the clause of the constitution which is considered vital and decisive here, is not even alluded to in that case. The reasoning of Judge Strong, however convincing and satisfactory it may be, is not to be taken as the opinion of the court; since, when we come to scrutinize the decision as finally made, it will be perceived that the real ground on which the act, the validity of which was in question there, was sustained, was that the existence of Schuyler county had for years been recognized by all departments of the government except the judicial. Successive sessions of the legislature had been organized and had acted upon the assumption of its constitutional existence, and it had entered into the whole structure and organization of the government. These acts, in the language of the judges who really made the decision, removed the subject from that region of doubt within

which it is competent and suitable for a court to declare legislative acts void as conflicting with the constitution. In this connection, also, the suggestion may be repeated, that the Schuyler county act contained a provision postponing the operation of the act in respect to the representation of the existing senate and assembly districts, and the election of incumbents to those offices, until the next decennial census; thus seeking to obviate the difficulty which the act we have been considering makes not even an attempt to surmount.

With regard to this point, the court of appeals, in the case of *Rumsey* v. *The People,* go no farther in their decision than to say—if indeed they say thus much—that "*it seems*" the legislature have the constitutional power to create a new county by the insertion of such a provision in the act. The case itself, so far as it can be deemed to decide any thing upon this point, would appear by implication to be an authority sustaining the view I have taken of the consequences of the failure of the act in question to provide a mode by which the electors in the exscinded territory could exercise the privilege of voting in any assembly election district, and thus, by this omission, for an indefinite period, practically disfranchising them.

Judgment in conformity with the stipulation in the case must be given for the defendant.

MULLIN, J., concurred.

PRATT, J., took no part in the decision.

W. F. ALLEN, J.; (dissenting.) The parties have agreed to a case and statement of facts, and have submitted the controversy between them to the decision of the court without action, as provided for by the code of procedure. The plaintiff is assessed and taxed by the common council of the city of Syracuse, as a resident of the city, in respect to real property within the bounds of the city as heretofore incorporated, but which was detached from the city and annexed to the

town of Dewitt, by chapter 341 of the laws of 1858. (*Session Laws, p.* 577.) The question is as to the validity of the act thus altering the bounds of the city of Syracuse and the town of Dewitt respectively, they having been in June, 1857, constituted parts of different assembly districts of the county of Onondaga, by the supervisors of the county, pursuant to the constitution and laws of the state. The change in the boundary lines of the city and town incidentally altered the boundary lines of the two assembly districts.

1. In construing acts of legislative bodies, they must be presumed to have intended only that which is apparent upon the face of the laws enacted by them. Their motives and intents cannot be questioned. If the apparent and well expressed purpose of the act of the legislature is within the legislative power, the validity of the act cannot be drawn in question upon the suggestion that an ulterior object and purpose, not within the scope of the power conferred upon the legislature, was contemplated. In other words, the act having a direct and proper application within the proper exercise of the legislative power, it will not be assumed that the legislature have fraudulently exercised their power and attempted to do that by indirect and circuitous action which they could not do directly. (*Supervisors of Niagara* v. *People,* 7 *Hill,* 505, 511. *People* v. *Draper,* 15 *N. Y. Rep.* 532, 545.)

2. All legislative power is vested in the senate and assembly of the state, and unless its exercise is restrained by express words of the constitution, or by necessary implication, those bodies are the sole judges of the fitness and propriety of legislative action in a given case; and their acts cannot be questioned or reviewed. (*Const. art.* 3, § 1. *People* v. *Draper, supra. Arnold* v. *Rees,* 18 *N. Y. Rep.* 57, 67.)

3. The incorporation of cities and villages, the erection and division of towns and counties, and the alteration of their boundaries, are legislative acts, and within the grant of power to the legislature. Plenary power is vested in the legislature to create, amend or divide, to define or alter the boundaries

of municipal corporations, as cities or villages, or towns and counties, which are mere political bodies and treated as corporations for certain purposes, and which are constituted for the purposes of civil government, unless some restriction or limitation, express or implied, as to the time or manner of the exercise of the power, is found in the constitution. (*People* v. *Morrell,* 21 *Wend.* 563. *Tanner* v. *Trustees of Albion,* 5 *Hill,* 121.)

4. There is no restriction or limitation, in terms, in the constitution, upon the power of the legislature to alter the boundaries of the political bodies which it may create from time to time, as the public good may seem to require.

5. The restriction by implication, which is urged to avoid the law, rests upon the provisions of section five of article three of the constitution. Provision is first made, by that section, for dividing the several counties in the state into assembly districts, on the first Tuesday of January next after the adoption of the constitution; the clause expressly prohibiting the division of a town in the formation of the assembly districts. The section then directs the legislature, at its first session after the return of any enumeration of the inhabitants of the state, to reapportion the members of assembly among the several counties of the state, and requires the boards of supervisors in such counties as shall be entitled to more than one member to assemble at such time as the legislature making the apportionment shall prescribe, and divide such counties into assembly districts in the manner before prescribed. And then follows the clause upon which stress is here laid : " And the apportionment and districts so to be made shall remain unaltered until another enumeration shall be taken under the provisions of " section four of the same article. The legislature is prohibited from reapportioning members of assembly among the counties, except at the decennial periods mentioned, and the boards of supervisors are placed under a similar disability in regard to dividing the counties into assembly districts. This is the extent of the prohibitory clause, applying

it to each body in reference to the duties devolving upon it. As the legislature has no power to constitute and form the assembly districts, the prohibition against altering them does not apply to it.   The duty of forming the assembly districts being expressly by the constitution cast upon the board of supervisors, it is necessarily excepted from the grant of legislative powers.   And the legislature is prohibited from either performing the same acts itself, or conferring the power upon any other body to do them.   As the legislature has no power to form the assembly districts, it necessarily follows that it has no jurisdiction over them to alter or change their boundaries; and without the prohibition referred to, the legislature would have had no authority to reorganize by law the assembly districts as formed by the boards of supervisors, or to alter their boundaries.   The act of the boards of supervisors thus charged with the duty would have been final as well upon the legislature as every other part of the government and the public. The prohibitory clause does not therefore detract in the least from, or touch, the power of the legislature over assembly districts.   But it does not follow that the legislature may not do what is clearly and confessedly within its power, because it may incidentally and in some of its details affect the work of the board of supervisors; as by changing the actual boundaries of the assembly districts formed by them.   It may safely be assumed that the legislature will proceed neither rashly nor recklessly so as either by design or inadvertence, to interfere substantially with the divisions of counties into assembly districts and affect the equality of the representation.   If this should be done, the error would doubtless be corrected as soon discovered.   But that the legislature may do wrong, is no no ground for depriving it of power, by implication.   The powers vested in the two bodies are not repugnant to each other; neither is the prohibition upon boards of supervisors, restraining them from altering the assembly districts, inconsistent with the power in the legislature to alter the boundaries of towns or other civil divisions of the state for the public

good. The power lodged with the supervisors having been executed, is *functus officio* until another census has been taken and another apportionment made; but the legislative power of the senate and assembly may be exercised at any time. It is no alteration of the districts, within the prohibition, so to alter the boundaries of towns or counties, that the territorial limits, the area, or population of an assembly district may be a little greater or less than as fixed by the supervisors. Towns cannot be divided in the formation of assembly districts, and if by addition of territory a town is made larger, the town as enlarged makes a part of the district, and that remains unaltered. It is the same district formed by the supervisors. The legislature cannot by direct enactment oust an individual from office before his constitutional time of office expires; but if in the exercise of the legislative powers of legislation, as by the division of a town or county, a party is ejected from office, the law is nevertheless constitutional. (*People* v. *Morrell, supra.*) Probably the legislature could not have directed that, notwithstanding the alteration of the boundaries of the city of Syracuse and town of Dewitt, the inhabitants of that part set off and annexed to Dewitt should, until the next census and apportionment, be deemed electors within the assembly district to which but for the alteration of boundaries they would have belonged. That would have divided a town, in the formation of assembly districts, which is forbidden by the constitution. It is incumbent on those alleging a want of power in the legislature to enact the law, to show that it is not within, or is excepted from, the grant of power. A prohibition to exercise a particular power is an exception to the general grant of power; and I look in vain, in the constitution, for an exception or prohibition, express or implied, which would reach this case. The cases cited from Massachusetts, as well as the opinions of the very able judges of the supreme judicial court of that state, in answer to interrogatories of the legislature, (6 *Cush.* 578, *and* 2 *Gray,* 84,) do not aid us, essentially, in the construction of our own constitution. The two systems

of state government, including the civil and municipal divisions of the states for election and other purposes, are arbitrary, and so entirely dissimilar in their essential features, that one cannot well be elucidated by reference to the other. The constitutional provisions of Massachusetts are peculiar, and in many respects, if not more stringent than our own, regulate more in detail the action of the legislature over the civil divisions of the state.

I am of the opinion that the act setting off a part of the city of Syracuse and annexing it to Dewitt was constitutional, and that judgment should be given for the plaintiff.

Judgment for the defendant.

[ONONDAGA GENERAL TERM, October 4, 1859. *Pratt, Bacon, W. F. Allen* and *Mullin,* Justices.]